**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 05-367 L**
**into which have been consolidated Nos. 05-484 L; 05-537 L; 05-1082 L; 05-1083 L; 05-1173 L; and 05-1175 L**

**( E-filed: May 5, 2006)**

| | | |
|---|---|---|
| **GERALD E. ROTH, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Judge Emily C. Hewitt** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ______________________________ | ) | |

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

PDF Create! 3 Trial
www.scansoft.com

GLADE L HALL, Esq.
105 Mt. Rose St.
Reno, Nevada 89509
Tel: (775) 324-6447
Fax: (775) 324-5387
Email: gladelhall@sbcglobal.net

Dated: May 19, 2006

**TABLE OF CONTENTS**

OPPOSITION TO MOTION TO DISMISS PURSUANT TO RCFC 12(b)(1) and RCFC 12(b)(6) . . . . . 6

MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS . . . . . 8

FACTS . . . . . 8

LAW:

ACCRUAL ANALYSIS . . . . . 15

EQUITABLE TOLLING IS AVAILABLE UNDER THE FACTS . . . . . 18

A "TAKING" IS NOT ESTABLISHED BY *HOLDEN* OR *PAYNE* . . . . . 19

PROCEDURAL DUE PROCESS CONSIDERATIONS ARE APPLICABLE . . . . . 20

LACK OF RECORDED DOCUMENTS . . . . . 21

DISCOVERY SHOULD GO FORWARD . . . . . 21

ARGUMENT:

COMMENCEMENT OF THE STATUTE OF LIMITATIONS . . . . . 22

EQUITABLE TOLLING . . . . . 23

OWNERSHIP ISSUES . . . . . 24

DISCOVERY SHOULD GO FORWARD . . . . . 25

CONCLUSION . . . . . 25

PDF Create! 3 Trial
www.scansoft.com

## TABLE OF AUTHORITIES

CASES:


*Amyx v. U. S.*, 228 Ct. Cl. 876 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Applegate v. U.S.* 25 F.3d 1579 (Fed. Cir.,1994) **. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17**

*Barnes v. United States*, 210 Ct. Cl. at 480 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Benchmark Resources v. U.S.*, 64 Fed. Cl. 526, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Board of Regents v. Roth, 408 U.S. 564 569, 92 S.Ct. 2701, 2705 (1972)* . . . . . . . . . . .20

*Braude v. United States*, 218 Ct. Cl , , 585 F.2d 1049, 1051-52 . . . . . . . . . . . . . . . . . . 15

*Castro v. United States*, 205 Ct. C. 534, 500 F.2d 436 (1974) . . . . . . . . . . . . . . . . . .. . 16

*Cienega Gardens, et al., v. U.S.*, 67 Fed. Cl. 434; 2005 U.S. Claims LEXIS 254 . . . . .18

*Coastal States Gas Corp. v. Dept. of Energy*, D.C. Del. 1979, 84 F.R.D. 278 . . . . . . . 22

*Competitive Associates, Inc. v. Fantastic Fudge, Inc.*, 58 F.R.D. 121 (1973) . . . . . . . .22

*Deason v. U. S.*, 54 Fed. Cl. 509 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Glus v. Brooklyn Eastern Terminal*, 359 U.S. 231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Harris v. County of Riverside*, 904 F.2d 497 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 20

*Holden v. U.S.*, 38 Fed. Cl. 732, 1997, U.S. Claims LEXIS 191 . . . . . . . . . . . . . . . . . .19

*Lawrence Marks v. U. S.* 34 Fed. Cl. 387 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Londoner v. Denver, 210- U.S. 373, 385, 28 S.Ct. 708, 713, 52 L.Ed. 1103 (1908)* . . . 20

*Loretto v. Teleprompter*, 458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Mennonite Bd. Of Missions v. Adams*, 462 U.S. 791, 800 [1983]) . . . . . . . . . . . . . . . . .21

*Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 [1950]*) . . . . . . . . . . . . 21

*Nitol v. U.S.*, 7 Cl. Ct. 405; 1985, U.S. Cl. Ct. LEXIS 1049 . . . . . . . . . . . . . . . . . . . . . 16

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 N. 13 (1978) . . . . . . . . . . . . . .22

*Oro Fino Consolidated Mines, Inc., v. The United States*, 118 Ct. Cl. 18 (1951) . . . . . .16

*Palazzolo v. Rhode Island, et al.*, 533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Payne v. U.S.*, 31 Fed. Cl. 709, 1994, U.S. Claims LEXIS 159 . . . . . . . . . . . . . . . . . . .19

*Rochester Gas and Electric Corp. v. U.S.*, 65 Fed. Cl. 431 . . . . . . . . . . . . . . . . . . . . . . .19

*Spevack v. United States*, 182 Ct. Cl. 884, 390 F.2d 977 (1968) . . . . . . . . . . . . . . . . . . .16

*United States v. Dickinson,* 331 U.S. Ct. 1382, 91 L. Ed. 1789 (1947) . . . . . . . . . . . . .15

*Washington ex rel. Seattle Title Trust Co. V. Roberge, 278 U.S. 116, 121 (1928)* . . . . 20

*Yuba Goldfields, Inc. V. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983) . . . . . . . . 15


STATUTES:


28 U.S.C. 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

NRS 111.315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21


PDF Create! 3 Trial
www.scansoft.com

**INDEX OF EXHIBITS**

| **Exhibit** | **Exhibit Description** |
|---|---|
| **1 (1-8)** | **Letters dated December 10, 2001 to each of the claimants from the U.S. Navy promising just compensation.** |
| **2.** | **Historical records of gold, silver, copper and lead production from the Fairview Mining District** |
| **3.** | **Photo of gated and posted access road** |
| **4.** | **Letter dated April 12, 1995 from U.S. Navy to Thomas Hoey** |
| **5.** | **Letter forwarded to Thomas Hoey through Barbara Vucanovich, U.S. Congress, with cover letter.** |
| **6.** | **Letter of November 19, 1997 from U.S. Navy to Thomas Hoey.** |
| **7.** | **Exerpts from the U.S. Navy Environmental Impact Statement concerning the proposed withdrawal** |
| **8.** | **Memo to Captain Rogers, U.S.N., from Thomas Hoey, with notes recording events circa June 12, 2000.** |
| **9.** | **Memo to Captain Rogers, U.S.N., from Thomas Hoey, regarding access being granted on an ad hoc basis.** |
| **10.** | **Memo to Captain Rogers, U.S.N., from Thomas Hoey, regarding no response to Exhibit J.** |
| **11.** | **Letter from Captain Rogers, U.S.N. to Thomas Hoey, dated July 24, 2001, regarding access will not be allowed. U.S. Navy going to purchase.** |
| **12.** | **Letter from Thomas Hoey to one "Mr. Urich" concerning agreement for settlement.** |
| **13.** | **Letter from Thomas E. Hoey, on behalf of Comvet Mining, making the claim that a taking of the subject claims has occurred.** |
| **14.** | **Cover letter and proof of mailing of Exhibit P. to the Secretary of the Navy.** |
| **15.** | **Letter from B. T. Goetsch, U.S.N., stating the Navy will compensate claimants** |
| **16.** | **Letter from D. D. Pruett, U.S.N., promising a response to an** |

PDF Create! 3 Trial
www.scansoft.com

**inquiry from Thomas Hoey.**

**17.** **Letter from George Duffy to Mr. Jerry Knowles of the Navy in response to Exhibit A-8.**

**18.** **Affidavit of Thomas Hoey**

**19.** **Affidavit of George Duffy**

**20.** **Affidavit of Gerald E. Roth**

**21.** **Affidavit of Relf L. Huddleston**

**22.** **Affidavit of Catherine Paulsen**

**23.** **Affidavit of Janet Ross**

PDF Create! 3 Trial
www.scansoft.com

**OPPOSITION TO MOTION TO DISMISS**

Plaintiffs hereby oppose the Government's Motion to Dismiss on the following grounds:

1. The emergency and temporary closure of access to the subject mining claims, which commenced in 1989, was, at the most, a temporary taking. The Statute of Limitations for such a taking does not commence until the end of the taking. The emergency and temporary interference with access did not end until the date of the known withdrawal of the surrounding lands by the Military Lands Withdrawal Act, which withdrew from public use the lands surrounding the subject claims and the lands across which access to the subject claims could be had. Plaintiffs submit that date is November 5, 1999, at the earliest. (The act withdraws the subject lands for a period of twenty-five years which is to end twenty-five years after November 6, 1999.) (Section 3015) All complaints herein were filed less than six years after that date.

2. The Government, through its agents, advised all Plaintiffs on December 10 2001, that the U.S. Navy would appraise and compensate them for the full value of their claims. Subsequent written and verbal communications between the Plaintiffs and their congressional representatives and the representatives of the U.S. Navy reinforces and buttresses this representation. Such representations went so far as to state that there was no statute of limitations running with regard to his claim. Such representations estop the Government from asserting the statute of limitations and/or equitably tolls the commencement of the running of the Statute of Limitations.

3. Each of the Plaintiffs have established by their affidavits and documents,



PDF Create! 3 Trial
www.scansoft.com

submitted herewith, that they are the undisputed owners of the subject claims and were such on the date of the taking of such claims by the imposition of the Military Lands Withdrawal Act, to wit, November 5, 1999.

4. The claim of Janet Ross is based on and supported by her assertion that the Military Lands Withdrawal Act has taken all reasonable access to her patented mining claim. Accordingly, she has been subject to a taking of that claim even if the claim is not within the area withdrawn by that act.

Such grounds are more particularly set forth in the Memorandum in Opposition to Motion to Dismiss set forth hereinafter.

PDF Create! 3 Trial
www.scansoft.com

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

**BACKGROUND FACTS:** Claimants are the owners of patented mining claims located in the Fairview Mining District, Churchill County, Nevada. This mining district is located on the West slope of Fairview Peak, above a large valley playa used for some time by the U. S. Navy as a target practice and bombing range, known as "Bravo 17". The boundary of Bravo 17 was 1 mile to the west of the remaining "ghost town" of Fairview.

The Fairview District was discovered in 1905. A boom ensued which gave the district a temporary population of 2000. The ore body contained gold, silver, copper and lead. A 20 stamp mill was located on the site and operated until 1917. Since that time a small amount of work has been done in the district by leasers and other companies. Exhibit 2, hereto, sets forth a list of the known production of the district between 1906 and 1937. The value of the production is fixed at $4,171,035.00 in then current dollar terms.

As set forth in the governments moving papers, the surrounding public lands were closed under an emergency closure order issued by the Bureau of Land Management in 1989.

In 1992 the Navy sought legislation from the U.S. Congress to expand the bombing range to include the Fairview Mining District. Congress refused. Accordingly, the Navy, together with the U.S. Bureau of Land Management, began to assert a claim that the lands the Navy was seeking contained unexploded ordinance.

PDF Create! 3 Trial
www.scansoft.com

**FACTS**

In 1989, the road leading to the area was gated and the gate posted with a sign that gave notice that it was " . . . unlawful to enter this area without permission of the commanding officer, NAS, Fallon, Nevada." (See Exhibit 3, hereto)

In response to an inquiry about access from Mr. Hoey of ComVets Mining, one Captain Sciabarra advised that "Various ordnance scraps were found off the range in the areas closed to the public.", therefore, the area was closed to all public access. Mr. Hoey is advised that, based on maps supplied by Mr. Hoey, the ComVets claims are not on the range or area of closure, but that the access road to the claims crosses the range. He further advised, "Currently, I cannot authorize use of the access road across the range and closed area. My staff is wording with BLM to study the feasibility of establishing an alternate access route to the general area near your mining claims." He continues, ". . . technology is not available to ensure all the ordnance contamination is removed. Therefore, the closed area is not planned for reopening in the near future." It is clear from this response that the representation continued to be that access was subject to approval, not irrevocably denied. (Exhibit 4)

Dissatisfied with the Navy's response, Mr. Hoey sought assistance from his then Congresswoman, Barbara Vucanovich. Captain Sciabarra responded to Congresswoman Vucanovich's inquiry by Exhibit hereto, which states: "Planning for the alternative route that we have been discussing with BLM is in progress. . . The Navy hopes to establish an alternative route by winter 1995." He continues: "The Navy is attempting to withdraw much of the property affected by the off-range ordnance in the Master Land

PDF Create! 3 Trial
www.scansoft.com

Withdrawal. The property considered for withdrawal included the closed areas bordering the range (B-17) near Mr. Hoey's mining claims. . . . If the environmental research shows that mining is not compatible with the land condition or uses, the process of compensating property owners for valid property rights **will** be followed." (Emphasis supplied) He then advises that "The Master Land Withdrawal process will not resolve Mr. Hoey's concerns immediately, because Congressional approval is required before property is withdrawn." (Exhibit 5) (Exhibit 18, para. 10)

On November 19, 1997, claimants were invited to attend an open house and public scoping meeting on the Legislative Environmental Impact Statement.(Exhibit 6) Mr. Hoey attempted to attend that meeting and was met at the door by a Navy representative and advised that he didn't need to speak because he was going to be compensated for his claims. (Exhibit 6)(Exhibit 18, para. 11)

Excerpts from the Navy's Environmental Impact Statement show that the then plans concerning claimants' property were "Category A lands would be closed to any mining activity to protect the public from existing and potential offrange ordnance." Under the category of "Mitigation" the representation is made that, "The Navy will explore means to compensate holder of impacted mining claims and valid unpatented mining claims on Category A lands. Acquisition of these claims and patents will be subject to congressional authorization and appropriation." (Exhibit 7)

The representation that claimants would be compensated once congressional authorization was obtained was orally reinforced by one Captain Rogers and confirmed by letter. (Exhibit 11) It was also stated by Captain Rogers that access would potentially

PDF Create! 3 Trial www.scansoft.com

be restored to the claims. (Exhibit 4) It is clear, as a result of these representations, that the claimants were lead to believe they would have access to their properties. (Exhibits 9 and 10)

On June 12, 2001, Mr. Hoey wrote a letter to a Navy representative, Bob Urich, (Exhibit 12) who forwarded the letter to Captain Rogers. Captain Rogers answered that "After exploring all the options before us, we concluded purchase of the patented mining claims would be the best long-term solution of this matter." Captain Rogers continued that he had sent a letter through his

" . . . chain-of-command requesting approval-in-concept to purchase, at fair market value, all the affected claims including yours. We are cautiously optomistic the aforementioned approval will arrive in the next few months. The timing and availability of funding remain uncertain as of this date." (Exhibit 11)

On September 1, 2001, Mr. Hoey gives formal notice that Comvets is asserting a takings claim. (Exhibits 13 and 14) The Navy responded by letter of October 12, 2001 by stating that " . . . the Navy is pursuing approval and funding to purchase the patented mining claims contained within the B-17 target withdrawal lands." The letter continues with the representation that "Once approval is received, Navy **will request documentation on the mineral content of the claims, identify funds for appraisal and site investigation, identify funding for the purchase of the mining claims, make purchase offers to claimants upon receipt of committed funding for that purpose, and negotiate to purchase the claims pursuant to the purchase offers**. (Exhibit 15) (Emphasis supplied) A second response of no consequence is sent by the Navy on

PDF Create! 3 Trial
www.scansoft.com

October 15, 2001 (Exhibit 16) None of the promised action was taken by the Navy.

The subject claims contain valuable ore deposits which, given higher prices for all minerals they contain would have significant value. George Duffy, one of the claimants who is experienced in valuing and dealing in such claims has valued his property at $360,000.00 as of February 4, 2002, based on the value of the silver content alone. (Exhibit 17 )

In December of 2001, the Department of the Navy notified the claimants, by letter, of the enactment of the Military Lands Withdrawal Act of 1999 (PL-106-65) and that the Navy was attempting to determine fair market value of the claims in order to compensate claimants for their loss of full use and enjoyment of their property. (Exhibits 1-(1-8)

The action taken by the Bureau of Land Management in 1989 did not close the patented mining claims. The notice specifically exempts the mining claims from closure in each of the sections of land in which the subject mining claims are located. The government's Exhibit B contains a description of the lands closed by that notice and, for each section in which the claimants' patented mining claims are located states: "excluding any patented mining claims." (See Pages 2 and 3 of said Exhibit B).

Furthermore the closure is of indefinite duration. The Federal Register notice specifically states ". . .closed to the public until further notice." The notice also specifies the reason for the closure as being terminable. The notice specifically states: "The closure is necessary to ensure public safety and allow the U.S. Navy to perform operations required to clean-up and dispose of live and inert ordinance on public lands

PDF Create! 3 Trial
www.scansoft.com

adjacent to Bravo 17."

The notice given on February 1, 1991 was likewise " . . . until further notice." Both of these notices are described as "Emergency Closure of Public Lands, Churchill County, NV". (U.S. Government Exhibits B and D)

The letter of December 29, 1989 to Senator Harry Reid also represents that " . . . the BLM has temporarily closed the affected lands and has erected appropriate warning signs." (U.S. Government Exhibit F) This letter also assures Senator Reid that "No private parties have suffered injuries or property damage as a result of these operations. In any event, private parties who believe they have suffered such injuries or damage will have their claims adjudicated in accordance with appropriate federal claims settlement requisitions."

Note that the statutory authority for the closure of access to the subject claims provides in subsection (b)(3), "(b) Each order shall: . . . (3) Specify the period of time during which the closure or restriction shall apply;" This language buttresses the view that the closures in 1989 and 1991 were to be temporary only. The language of the December 10, 2001 letter from the Navy to each of the claimants (Exhibits 1(1-8) states specifically that the closure in 1989 was " . . .an emergency closure . . .".

Each of the claimants herein are the undisputed owners of their respective patented mining claims. Exhibits 18-23) Each of the claimants acquired their claims prior to the enactment of the Military Land Withdrawal Act, and have continuously paid all real property taxes upon such claims, ever since that date. Id. The U.S. Navy has never paid taxes on the claims or made payments in lieu of taxes.

PDF Create! 3 Trial www.scansoft.com

Each of the claimants herein received a copy of the letter affixed to claimants Opposition to Motion to Dismiss as Exhibits 1 (1 through 8) in December of 2001. Each of the claimants relied upon the representation that the U.S. Navy would appraise and compensate them for the full value of such claims. Id. Each of the claimants always expected that the U.S. Navy would contact them and negotiate a sale of the subject claim when funds were available, as represented in Exhibits 1 (1-8).

None of the claimants received actual notice of the taking of their claims, although the Navy obviously knew of their identity and whereabouts. Id. None of the claimants were advised that there was a statute of limitations running and they were always lead to believe that the U.S. Navy would eventually pay just compensation for the taking of their claims. Id.

The presently discovered documentary evidence of communications with representatives of the U.S. Navy shows claimants were repeatedly advised that when funds were available the U.S. Navy would provide just compensation for the taking of their claims. Such advise was given as recently as April 22, 2005. Claimants were advised by letter that the only impediment to just compensation was difficulty in obtaining funds, but that the Navy was taking steps to obtain the necessary funds.

In the case of George Duffy, he was referred to one Beverly Freitas, who was represented to be a member of the real estate team of J. L. Betancourt, U.S. Navy. He contacted Ms Freitas on several occasions and was specifically advised that there was no statute of limitations running on his claim for just compensation. He was also referred to one Antoinette Perez at (619) 532-2331. Ms. Perez advised Affiant that

PDF Create! 3 Trial
www.scansoft.com

there was no time limit on my claim and that the Navy must make an offer before going into eminent domain. (Exhibit 19)

In the case of Janet Ross, she states in her affidavit that the only reasonable access to her claim is by a roadway that crosses the withdrawn lands and that this roadway has been gated and locked by agencies of the U.S. Government. This is the same roadway that accesses each of the subject claims herein. The blockage of that access in 1989 was temporary. That access is admittedly across the lands permenently withdrawn by the Military Lands Withdrawal Act. Denial of all reasonable access is a taking. (Exhibit 23)

The causes of action alleged in the plaintiffs' complaints each are based on the known and fixed taking caused solely by the imposition of the withdrawal of lands pursuant to the Military Lands Withdrawal Act. (Complaints herein)

**LAW**

In passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader. In rendering a decision, a court must presume that the undisputed factual allegations included in the complaint by plaintiffs are true. . . . A court should not grant a motion to dismiss unless it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Lawrence Marks v. U. S.* 34 Fed. Cl. 387 (1995)

**ACCRUAL ANALYSIS:**

Any claim that is not filed within 6 years after such claim "first accrues" is

PDF Create! 3 Trial
www.scansoft.com

barred by the statute of limitations, 28 U.S.C. 2501. The owners of the mining claims taken in this case assert that the taking first accrued when the twenty-five year withdrawal of lands, pursuant to the Military Lands Withdrawal Act, first took effect on November, 6, 1999.

The owners further claim that the statute of limitations was tolled because of the misconduct and representations of representatives of the Navy.

A claim for just compensation in a taking case by inverse condemnation is uniquely fact intensive. Denial of a taking claim on the basis of the defense of limitations is warranted only where the facts alleged demonstrate conclusively that such decision is required as a matter of law. *Yuba Goldfields, Inc. V. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983)

The cause of action for an inverse condemnation accrues not when the actual or physical taking occurs but when it is determinable by the plaintiff. Limitations do not run until the plaintiff knows or has reason to know both that his land has been taken and the extent of the taking. *Braude v. United States*, 218 Ct. Cl , , 585 F.2d 1049, 1051-52; *Barnes v. United States*, 210 Ct. Cl. at 480.

A taking does not accrue if the extent or duration of the taking is unknown, and the running of the statute of limitations will be suspended when an accrual date is ascertained, but injury from defendant's conduct has been concealed. *United States v. Dickinson*, 331 U.S. Ct. 1382, 91 L. Ed. 1789 (1947) *Castro v. United States*, 205 Ct. C. 534, 500 F.2d 436 (1974); *Spevack v. United States*, 182 Ct. Cl. 884, 390 F.2d 977 (1968).



PDF Create! 3 Trial www.scansoft.com

In *Nitol v. U.S.*, 7 Cl. Ct. 405 (1985) a situation similar to the instant action was considered by this Court. This Court applied the law developed by *Dickinson* and its projeny in holding that the taking of property by the nuclear testing program in the Marshal Islands "consisted of an intermittent sequence of events over an extended period of time, and was of uncertain duration until terminated by Presidential order. In such a sequence, the fact of any taking and the consequences thereof would not be manifest so that a final account could be struck until the program terminated."

As this Court stated in *Amyx v. U. S.*, 228 Ct. Cl. 876 (1981), after refering to the Castro case, "In other words, the sources of the problem may be continuous in nature, and it would not be in the interests of justice to require piecemeal suits. It is only reasonable that such a cause of action not be understood to accrue when the taking begins unless the damage is total, permanent and immediate, but rather when the damage stabilizes sufficiently to allow computation of damages.

This Court considered a mining case applying the same *principles,Oro Fino Cnsolidated Mines, Inc. v. The United States*, 118 Ct. Cl. 18 (1951). In that case the government had imposed an order closing the operation of a gold mine in Placer County, California, by order of the Director of Operations of the War Production Board because the mine was not considered essential to the war effort. The closure was indefinite and continued from October of 1942 to June of 1945. This Court held that: "The problem here is not so much when the taking, if it was a taking, occurred, as what it was, precisely that was taken. Until Order L-208 was revocked, no one could know exactly what had been taken from the standpoint of compensation. . . Under the

PDF Create! 3 Trial
www.scansoft.com

circumstances, it would be unfair if the statute had started running against plaintiff at a time when there was no way of knowing the duration of the interest taken." This Court then quoted from Dickinson the holding that "an aggrieved owner need not bring suit until the consequences of the taking 'have so manifested themselves that a final account may be struck.'"

In *Applegate v. U.S.* 25 F.3d 1579 (Fed. Cir.,1994) the Federal Circuit considered the statute of limitatins issue in a factual setting where the Army Corps of Engineers had constructed the Canaveral Harbor, which prevented the natural littoral flow of sand to replenish the shoreline of 41 miles of white sandy beach, including the Applegate property. The disruption of the flow commenced in 1952 and resulted in the gradual accretion of the shoreline. Congress appropriated funds to implement a sand transfer plant which would have restored the littoral flow and restore the beaches. In 1971, however, the Corps announced the first of a series of delays. In 1970 a single landowner brought suit alleging a taking. This suit was dismissed and appealled resulting in a holding that the a taking does occur for errosion above the high water mark. Applegates filed their takings claim in 1992 and the United States moved to dismiss based on the the six-year statute of limitations. This Court granted that motion, but the Federal Circuit reversed, holding that a taking effected by a "continuing process of physical events" did not require the owner to resort to piecemeal or premature litigation to avoid the opertion of the statute of limitations. The court reasoned:

if suit must be brought, lest [the property owner] jeopardize his rights, as soon

PDF Create! 3 Trial
www.scansoft.com

> as his land is invaded, other contingencies would be running against him -- for instance, the uncertainty of the damage and the risk of res judicata against recovering later for damage yet uncertain.

The Federal Circuit relied on *Dickinson* for the general proposition that the claimant can postpone filing a suit "until the [continuing taking] situation becomes stabilized." *Dickinson* at 749. More importantly for the instant action, the Federal Circuit noted that the slow physical process was not the only event inhibiting stabilization. The court cited the continuing promise of a sand transfer plant to remedy the physical process. This meant "the land owners did not know when or if their land would be permanently destroyed. The court quoted from the U. S. Supreme Court's decision in *Loretto v. Teleprompter*, 458 U.S. 419 (1982): "When the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred." The uncertainty of the situation stayed the accrual of the claim.

This court has now made a clear statement of the resolution of these holdings in *Cienega Gardens, et al., v. U.S.*, 67 Fed. Cl. 434; 2005 U.S. Claims LEXIS 254. (The Statute of Limitations for a temporary taking commences at the end of the temporary takings period.)

**EQUITABLE TOLLING IS AVAILABLE UNDER THE FACTS OF THIS CASE:**

The doctrine of equitable tolling may also be employed in the instant action. This court employed that doctrine in *Deason v. U. S.*, 54 Fed. Cl. 509 (2002) where an employee had been led to believe he would be compensated for his overtime. This Court found that the employee had been induced by the conduct of his supervisors to

PDF Create! 3 Trial
www.scansoft.com

rest on his rights by affirmatively misleading him to believe that the overtime would be paid. In the instant action, the letter of December 10, 2001 affirmatively states the Navy was attempting to determine fair market value of the claims in order to compensate claimants for their loss of full use and enjoyment of their property. (Exhibit ) This court has ruled that persons have a right to rely on the representations of the United States and its agents and that such representations, when false, toll the statute of limitations. *Nitol v. U.S.*, 7 Cl. Ct. 405; 1985, U.S. Cl. Ct. LEXIS 1043. Equitable tolling is available when the lateness is attributable, at least in part, to misleading statements.

Equitable tolling has been held by this court to be available where the complaint has been induced or tricked by the government's misconduct into allowing the filing deadline to pass. *Benchmark Resources v. U.S.*, 64 Fed. Cl. 526, 2005. Mere inducement by the government has been held to be sufficient to toll the statute. *Glus v. Brooklyn Eastern Terminal*, 359 U.S. 231.

This law applies to the correspondence to the various claimants and to the representations specifically to George Duffy that there was no statute of limitations running against his claim.

**A TAKING IS NOT ESTABLISHED BY *HOLDEN* OR *PAYNE:***

The government has cited this court to the cases of *Holden v. U.S.*, 38 Fed. Cl. 732, 1997, U.S. Claims LEXIS 191 and *Payne v. U.S.*, 31 Fed. Cl. 709, 1994, U.S. Claims LEXIS 159. These opinions are of no moment to the instant action. They involve unpatented claims and the issue is the validity of those claims. The issue of



PDF Create! 3 Trial www.scansoft.com

whether a taking has occurred at the date of those actions is not presented or adjudicated. They do not support a conclusion that a taking had occurred at that point in time, but rather a conclusion that the government attorney made the decision at that time to challenge the claims based on a lack of showing that the claims were valid.

**OWNERSHIP ON THE DATE OF TAKING IS NOT REQUIRED TO SUPPORT A CLAIM FOR JUST COMPENSATION**:

This court's opinion in *Rochester Gas and Electric Corp. v. U.S.*, 65 Fed. Cl. 431, 2005 U.S. Claims LEXIS 137, clearly holds that a takings claim may be bifurcated between owners who held the property over the period of taking. Accordingly, it is not necessary that a person be an owner on the date the taking is recognized to be a proper party to a cause of action for a taking. See also, *Palazzolo v. Rhode Island, et al.*, 533 U.S. 606 (2001);

**PROCEDURAL DUE PROCESS CONSIDERATIONS ARE APPLICABLE IN THE INSTANT ACTION:**

Procedural due process requirements apply to government deprivation of the constitutional protection of liberty and property. *Board of Regents v. Roth, 408 U.S. 564 569, 92 S.Ct. 2701, 2705 (1972)* The right of an owner to devote his land to any legitimate use is properly within the protection of the Constitution. *Washington ex rel. Seattle Title Trust Co. V. Roberge, 278 U.S. 116, 121 (1928)* An ordinance purporting to prohibit such use may not be made without constitutional due process notice and hearing requirements being met when " a relatively small number of persons was concerned, who were exceptionally affected, in each case upon individual

PDF Create! 3 Trial
www.scansoft.com

grounds,"*Harris v. County of Riverside, 904 F.2d 497 (9th Cir. 1990) citing Londoner v. Denver, 210- U.S. 373, 385, 28 S.Ct. 708, 713, 52 L.Ed. 1103 (1908)* In the instant action there were clearly a relatively small number of persons who were being exceptionally affected. In the instant action, the loss of the use and enjoyment of claimants' claims by adoption of an act purporting to deprived them of the use to which the claims had been historically used denied them of a clear property interest. They were, therefore, entitled to constitutional procedural due process before the taking of their claims could occur. *Harris,* Supra. The notice requirements for such a deprivation of use are extensively set forth in the Circuit Court opinion in *Harris.* They are that once it is determined that due process applies, notice is required that is reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections at a meaningful time and in a meaningful manner. *Harris, pg. 503 (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 [1950])*. Notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interest of any party . . . if its name and address are reasonably ascertainable. *Harris* pg. 504 (citing *Mennonite Bd. Of Missions v. Adams*, 462 U.S. 791, 800 [1983]) Clearly the names and addresses of the claimants was reasonably ascertainable by the U.S. Navy. Accordingly, such notice was required before the taking could occur. There is no question on the record before this court that the U.S. Navy did not give such notice until its letter to each of the claimants on December 10, 2001. If the Navy should assert that the notice it gave of the enactment of

PDF Create! 3 Trial
www.scansoft.com

the Military Lands Withdrawal Act was adequate notice under the legislative acts doctrine, the court should be aware of the holding that any land use decision less extensive than general rezoning cannot be insulated from notice and hearing requirements by application of the legislative acts doctrine. *Harris, pg. 502, Supra.*

**LACK OF RECORDED DOCUMENTS:**

Nevada statute, NRS 111.315 provides for recording of conveyances of real property. That statute specifically states: "Every conveyance of real property, to operate as notice to third persons, shall be recorded in the office of the county recorder . . **. but shall be valid and binding between the parties thereto without such record**." (Emphasis supplied) Accordingly, the title of Paulsen is not affected by the inability of the government to find a recorded document demonstrating her title.

**DISCOVERY:**

Where issues arise as to jurisdiction . . . discovery is available to ascertain the facts bearing on such issues. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 N. 13 (1978). Discovery should precede consideration of dispositive motions when facts sought to be discovered are relevant to consideration of the particular motion at hand. *Coastal States Gas Corp. v. Dept. of Energy,* D.C. Del. 1979, 84 F.R.D. 278. See also *Competitive Associates, Inc. v. Fantastic Fudge, Inc.*, 58 F.R.D. 121 (1973)

**ARGUMENT**

**COMMENCEMENT OF THE STATUTE OF LIMITATIONS:**

The interference with access to the subject claims which commenced in 1989 was temporary. The Federal Register notice relied on by the government clearly states

PDF Create! 3 Trial
www.scansoft.com

that the action was temporary. (Government Exhibit F, pg. US00025). This interference is also claimed to be justified in order to allow the government to clean up the area. The correspondence represents that the clean up will occur. Permission to enter the area was represented to be available. A government arranged alternative access was, likewise, presented as a possibility. Planning for such a route was represented to be in progress. The termination date for the interference that commenced in 1989 is "until further notice." Accordingly, if a "taking" occurred in 1989, it was clearly a temporary taking.

The running of the statute of limitations for a temporary taking would only commence at the termination of the temporary taking. The temporary taking would only end when the known twenty-five year period of taking commenced on withdrawal pursuant to the Military Lands Withdrawal Act. At that point in time all of the plaintiffs herein were in title to their respective claims.

Approached by another path of analysis, it is clear that this court's development of the law, concerning when a statute of limitations commences, equates that commencement to the point in time when a taking is known and definable. That is the point in time when a takings claim "accrues". The considerations used by the court for purposes of fixing the statute of limitations do not differ from the considerations that should be used to define who is entitled to just compensation for the taking. That is, if the point in time of commencement of the statute of limitations is different from the point in time that a taking occurs, then the statute of limitations is being extended, or shortened, and misapplied. Consistency of analysis dictates that the point in time for the commencement of the statute of limitation must be the same point as the point in time

PDF Create! 3 Trial
www.scansoft.com

when ownership for purposes of determining who is entitled to just compensation. Otherwise, an owner who sold just prior to the end of a temporary taking would have his or her statute of limitations lengthened because the statute of limitations would commence at the end of the temporary taking. Each of the plaintiffs herein owned their respective claims on the date when the taking occurred in this case.

**EQUITABLE TOLLING:**

Taken as a whole, the correspondence between the Navy and the claimants makes abundantly clear that the Navy did not believe that a taking had occurred until passage of the Military Lands Withdrawal Act. It is only after the passage of that act that the Navy begins to represent that compensation will be forthcoming.

Also, taken as a whole it is clear the Navy made numerous representations that it would provide just compensation to the plaintiffs. These were affirmative representations which were not fulfilled, thus, they were misrepresentations to these plaintiffs and to their congressional representatives.

**THE OWNERSHIP ISSUES:**

The affidavit of Janet Ross sets forth her chain of title. She is a joint tenant pursuant to the deed affixed thereto as Exhibit D. She is the surviving joint tenant pursuant to the death certificate of her joint tenant, affixed thereto as Exhibit E. Accordingly, she is the undisputed owner of the Argel No. 2 patented mining claim, by virtue of the legal incidents of joint tenancy with right of survivorship.

The Navy recognized and admitted that "Churchill County Assessor Parcel Records indicate you (Catherine Christie) own a patented mining claim within the

PDF Create! 3 Trial
www.scansoft.com

affected area." Exhibit 1 (1) Catherine Paulsen is the married name of Catherine Christie. That is, they are one and the same person. Accordingly, Catherine Paulsen is entitled to just compensation for the taking of her claim.

It is admitted by the government that Comvets owned its claim on the date relevant to this takings claim, at the earliest, November 5, 1999.

**DISCOVERY SHOULD GO FORWARD:**

Note that it was only by fortuitous circumstance that the claimants have retained copies of correspondence. There is much indication in such correspondence that other documents exist which have not been discovered at this time. Claimants should be given the opportunity to conduct such discovery before this court takes any action to dismiss this case. Such discovery could well produce other communications by the Navy to claimants that contain representations that the statute of limitations was not running with regard to their claims or that dissuaded the claimants from bringing their claim.

In this connection, it should also be noted that the December 10, 2001 letter sent to each of the plaintiffs was not included in the documents submitted to the court in support of the instant motion. This would appear to indicate a gap in the fulfillment of counsel's duty of candor to this court. Accordingly, it is submitted that discovery of all the documents the government has with regard to the claims of these plaintiffs should proceed, before their causes of action are extinguished by a premature dismissal.

**CONCLUSION**

The statute of limitations applicable in this action did not commence until the

PDF Create! 3 Trial www.scansoft.com

intended twenty-five years of withdrawal commenced, November 6, 1999. Accordingly, all of the claims asserted herein are within the applicable statute of limitations.

The U.S. Navy is estopped by its representations of impending compensation from asserting a statute of limitations defense and/or the commencement of the running of the statute is equitably tolled. .

The claimants herein are all owners of the subject claims on the date of taking, November 5, 1999. Accordingly, there is no reasonable dispute as to their right to assert their respective claims.

Janet Ross has been denied all reasonable access to her claim, regardless of whether the claim is surrounded by withdrawn lands.

For these reasons, the motion to dismiss should be denied in all respects.

Dated this 18th day of May, 2006.

Respectfully submitted

Glade L Hall, Esq.
Attorney for Claimants

S/ Glade L Hall
105 Mt. Rose St.
Reno, Nevada 89509
Tele: (775) 324-6447
Fax: (775) 324-5387
Email: gladelhall@sbcglobal.net

NOTE: Experiencing difficulty with scanned Exhibits; Exhibits will follow

PDF Create! 3 Trial
www.scansoft.com