# EXHIBIT A

**Volume 1**

## Final Environmental Impact Statement

# Withdrawal of Public Lands for Range Safety and Training Purposes Naval Air Station Fallon, Nevada



**May 1998**

**Department of the Navy**
Naval Air Station Fallon
Fallon, Nevada

### 4.2.10 Mineral Resources

Impacts to mineral resources would be influenced by the existence of minerals within the land withdrawal area, the availability of the lands to extract those minerals, and the land use controls applied to mining operations on the land. Potential direct impacts associated with the land use controls are described below.

#### *4.2.10.1 Alternative I*

Impacts: Under all withdrawal alternatives, Category A lands would be closed to any mining activity to protect the public from existing and potential off-range ordnance. Mining would be allowed on Category B lands subject to existing mining laws but the Navy will have final approval authority on permits for claim improvements and no claims may be patented after the lands are withdrawn.

The following discussion on locatable minerals applies to the entire withdrawal area except for the shoal site and those lands in the B-16 area withdrawn by BUREC. These areas were withdrawn from mineral entry prior to the Navy's application for land withdrawal.

- *Exploration.* Significant unmitigable impacts would occur on Category A lands because no exploration may take place. The greatest impact would occur on Category A lands with high mineral potential. Approximately 2,200 acres in the Fairview District south and east of B-17 and 2,300 acres in the Cinnabar Hill area east of B-19 would be affected.

  Casual exploration on Category B lands would be allowed except at military sites. This would not be a significant direct impact because these sites are small, are dispersed over a wide area, and are unlikely to affect exploration.

- *Mining Claim Location (Staking New Claims).* Significant unmitigable impacts would occur on Category A lands because no claims may be located.

  No controls to locating mining claims on Category B lands would occur except at EW, TACTS, and visual cueing device sites during the time of their use. This would not be a significant direct impact because developed military sites would occupy a small percentage of the withdrawal area and would avoid areas with high mineral potential or existing claims.

- *Development.* Significant unmitigable impacts would occur on Category A lands because access to unpatented and patented claims would not be allowed, potentially resulting in a loss in revenue and, in the case of



US 00101

patentees and holders of valid unpatented mining claims, a loss of private property or mineral rights.

Applications for BLM permits for mining on Category B lands would require Navy review and approval. Approval would be granted where development was compatible with Navy training operations. Development on fenced military sites would not be permitted. In the case of visual cueing device sites, this impact would be temporary, as the sites could be developed once the visual cueing device was moved. Five permanent EW and TACTS sites, comprising at most twenty-five acres, would be located to avoid existing developments. This would not be a significant direct impact.

- *Patenting*. Significant unmitigable impacts would occur on Category A lands because no claims may be patented.

  No new patents would be allowed on Category B lands after the withdrawal. While unpatented claims still guarantee the claimant exclusive rights to the minerals in the claim, restricting patenting would result in potentially adverse impacts. Maintaining claims in an unpatented status would continue to require paying an annual fee and obtaining permits for any improvements. Maintaining the claims in an unpatented status also would preclude a claimant from the land ownership that accompanies patenting a claim. These adverse effects would be limited in that there are no areas with high mineral potential within the Category B lands except in the Wonder District (Figure 3-9).

Impacts to leasable minerals could result from controls on access to Category B lands and on the height limitation of structures. The height limitation could affect oil, gas, and geothermal well drilling, as this equipment often exceeds 50 feet. In addition, no new leases could be issued on Category A lands. These impacts are not projected to be significant since the mineral inventory revealed no lands in the withdrawal area with high leasable mineral potential.

Potential impacts to salable minerals could result from restrictions to development on Category A lands. The current sites (managed by NDOT and located in the EW and B-17 proposed withdrawal areas along Highway 50, the Sheelite Mine Road, and the Dixie Valley Road) are considered valid existing rights. There are vast quantities of salable materials on the lands outside the proposed withdrawal area; therefore, no significant impacts to access of salable minerals are anticipated.

Mitigation: The Navy will explore means to compensate holders of impacted mining patents and valid unpatented mining claims on Category A lands.



US 00102

Acquisition of these claims and patents will be subject to congressional authorization and appropriation.

With regard to height limitations on development structures in Category B lands, waivers could be issued by the Navy on a case-by-case basis, depending on the proposed location and duration of time the structure will be needed. The Navy will explore the possibility of accommodating equipment necessary for oil, gas, and geothermal drilling if it is to be installed for relatively short periods or in locales where it does not pose a safety hazard to military operations.

#### *4.2.10.2 Alternative II (Preferred Alternative)*

Impacts: The land use category designations for Alternative II are the same as those for Alternative I and impacts would be similar to those described for Alternative I. The primary exception would be for those lands not included in the Alternative II withdrawal area, including land in the Wonder District (including the Silver Center Claims) and Sand Springs District. The Wonder District and portions of the Sand Springs District have been identified as having high mineral potential, so removal of these areas from the withdrawal would lessen the impacts.

Mitigation: Mitigation measures will be the same as described for Alternative I.

#### *4.2.10.3 Alternative III*

Impacts: Impacts under Alternative III would be similar to those described under Alternative I.

Mitigation: Mitigation measures will be the same as described for Alternative I.

#### *4.2.10.4 No Action Alternative*

Impacts: The No Action Alternative would not withdraw any public lands. Impacts to mining on off-range ordnance lands would continue to be handled through BLM and Navy administrative processes.

Mitigation: No mitigation.

### 4.2.11 Livestock and Wild Horse Management

#### *4.2.11.1 Alternative I*

Impacts: Alternative I would not significantly affect livestock or wild horses on Category B lands. Grazing activities and wild horses would not be allowed



US 00103

# APPENDIX H MINING CLAIMS

In Nevada, all patented and unpatented mining claims must be filed with the Bureau of Land Management State Office in Reno and the county in which the claim was made. The BLM State Office maintains a database of mining claims that includes the claim name, the current status of the claim, its location date, and its location by township, range, section, and subdivision. Information on the current number and location of patented and unpatented mining claims was obtained from this database.

Data on township, range, section, and subdivision were compared to the withdrawal area to determine which claims fell within the proposed land withdrawal footprint. The location date was used to determine which claims were located after the lands were closed to mineral entry. An assessment was performed to determine whether claims are located on land segregated in 1982 or land segregated in 1992. Finally, the claim was compared to the proposed withdrawal area to determine its location in reference to the ranges and Category A and B lands. Table H-1 lists the patented claims and Table H-2 list the unpatented claims located in the withdrawal area. The general locations of the patented and unpatented claims thought to be active in the entire withdrawal area are shown on Figure H-1.

## TABLE H-1. PATENTED MINING CLAIMS

| Township | Range | Section | Claim Name | Patent Number | M.S. Number | Location/ Category |
|---|---|---|---|---|---|---|
| *Alternatives I, II, and III* | | | | | | |
| 15N | 34E | 7,18 | Bluff<br>Gold Coin<br>Gold Coin 1<br>Gold Coin 2<br>Fraction | 289653 | 3914 | B-17/ Category A |
| 16N | 34E | 17 | Detroit<br>Tiger | 47231 | 2745 | B-17/ Category A |
| 16N | 34E | 17 | Florence #3<br>Blue Bell<br>Little Fellow | 47230 | 2668 | B-17/ Category A |
| 16N | 34E | 17 | Ohio<br>Ohio No. 1 | 83149 | 3206 | B-17/ Category A |
| 16N | 34E | 17 | Great Falls | 149254 | 3752 | B-17/ Category A |
| 16N | 34E | 16 | Lookout No. 2 | 90643 | 3383 | B-17/ Category A |
| *Alternatives I and III* | | | | | | |
| 19N | 34E | 32 | Golden Dawn No. 2<br>Golden Dawn No. 3 | 17330 | 3671 | Dixie Valley/ Category B |
| *Alternative I* | | | | | | |
| 19N | 34E | 36 | Bumble Bee<br>Grey Horse<br>Grey Horse 1<br>Grey Horse 2<br>Triangle Fraction<br>Kingstone | 252474 | 3425 | Dixie Valley/ Category B |
| 19N | 34E(35E) | 36(31) | Spider<br>Wasp<br>Tony Pah<br>Long Nel<br>Last Chance | 29199 | 3064 | Dixie Valley/ Category B |
| 19N | 34E(35E) | 36(31) | Silver Tip<br>Valley View<br>Pan Handle<br>Yellow Jacket | 104739 | 3398 | Dixie Valley/ Category B |
| 19N | 34E(35E) | 25,36(30) | Navadan<br>Little Witch | 104739 | 3398 | Dixie Valley/ Category B |
| 19N | 34E(35E) | 25(30) | Lost Chord<br>King Midas<br>King Midas 1<br>King Midas 2<br>King Midas 3 | 263382 | 3885 | Dixie Valley/ Category B |
| 19N | 34E(35E) | 25(30) | Great Eastern 1<br>Great Eastern 3<br>Great Eastern 4 | 32958 | 3122 | Dixie Valley/ Category B |

Source: Nevada State Office of the Bureau of Land Management, Reno, Mining Claim Database

# EXHIBIT B

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

No. 05-367 L
into which have been consolidated Nos. 05-484 L, 05-537 L, 05-1082 L, 05-1083 L, 05-1173 L, and 05-1175 L

| | | |
|---|---|---|
| GERALD E. ROTH, et. al., | ) | |
| Plaintiffs, | ) | Honorable Emily C. Hewitt |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DECLARATION OF BEVERLY J. FREITAS**

I, Beverly J. Freitas, do hereby declare:

1. I am currently a Senior Realty Specialist with Anteon Corporation, working under a contract for the United States Coast Guard. I have held this position since January 4, 2006. Previously, I worked for the Department of the Navy as a Civilian Employee. My position was Business Line Team Leader for Real Estate, Integrated Product Team West, Naval Facilities Engineering Command, Southwest, San Diego, California. My office was located in Daly City, California. I retired from this position on January 3, 2006. Part of my area of responsibility for Real Estate included the Naval Air Station, Fallon, Nevada. This entailed working on various mining claim issues at Fallon.

2. During my position with the Department of the Navy, I spoke with Mr. George D. Duffy, an owner of a patented mining claim identified as Boulder #1, Churchill County, Nevada, by telephone. Mr. Duffy asked about the status of the Government acquiring his claim. I advised him that the Department of the Navy did not have money allocated for any purchases of mining claims at this time, however, it was trying to obtain the funding. If funding was received, the Department of the Navy would make Mr. Duffy an offer to purchase his mining claim for the established fair market value. At no time during the conversation did the issue of statute of limitations arise, nor did I make any mention of the statute of limitations running out on any issues concerning his mining claim.

Under penalty of perjury, and pursuant to section 1746 of Title 28, U.S. Code, I declare that the foregoing is true and correct to the best of my knowledge.

Executed on the 16th day of June, 2006.

Beverly J. Freitas
Senior Realty Specialist
Anteon Corporation
Oakland, California

# EXHIBIT C

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

No. 05-367 L
into which have been consolidated Nos. 05-484 L, 05-537 L, 05-1082 L, 05-1083 L, 05-1173 L, and 05-1175 L

(E-filed: June 19, 2006)

| | | |
|---|---|---|
| GERALD E. ROTH, et. al., | ) | |
| Plaintiffs, | ) | Honorable Emily C. Hewitt |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DECLARATION OF ANTIONETTE PEREZ**

I, Antoinette Perez, do hereby declare:

1. I am currently employed as a Realty Specialist by the Department of the Navy, Naval Facilities Engineering Command Southwest. In this capacity I am responsible for disposal planning, reconnaissance, condemnation reports, title research, economic analysis, transfer or withdrawal documents, preparation of contracts such as licenses and leases, and preparation of other contracting documentation. I have held this position since August 8, 2005.

2. Before accepting civilian employment with the Department of the Navy, I served on active duty from July 22, 1985 through July 31, 2005 in various duty stations both in the United States and overseas. My last duty station was Commander, Navy Region Southwest in San Diego where I was a Flag Writer/Personal Executive Assistant to Rear Admiral Betancourt from February 2002 – July 2005. I retired as a Chief Petty

Officer/E7. In my capacity as Flag Writer for Navy Region Southwest, I had no contact with any mine owners or plaintiffs of this lawsuit.

3. Shortly after I began working as a Realty Specialist, I was assigned the "Mining Claim Project" in October/November 2005. These claims had previously been handled by Beverly Freitas a Realty Specialist on our IPT West Team in Daly City, San Francisco, but were being transferred to NAVFAC SW as Ms. Freitas was retiring from the Department of the Navy. As part of the orderly project transfer process, Ms. Freitas provided Mr. George Duffy with my office telephone number as the new point of contact for the project. When I received the project, I was aware that three of the mine owners had filed a lawsuit.

4. I have never personally spoken with, corresponded with, or received a telephone call from Mr. George Duffy or his wife, Mrs. Margaret Duffy. Additionally, I have not personally spoken with, corresponded with or received a telephone call from any of the other mine owners or plaintiffs in this matter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 14, 2006, San Diego, California

Antoinette Perez

Realty Specialist

Naval Facilities Engineering Command, Southwest